IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION

NO. 2:05-CV-21-FL

_____

|  |  |
|---|---|
| ) | |
| JAMES ALAN GELL, ) | |
| ) | **MEMORANDUM IN OPPOSITION** |
| Plaintiff, ) | **TO DEFENDANT'S MOTION TO** |
| ) | **STRIKE AFFIDAVIT AND** |
| ) | **DEPOSITION TESTIMONY** |
| v. ) | |
| ) | |
| DWIGHT RANSOME, ) | |
| ) | |
| Defendant. ) | |
| ) | |

_____

## I.  Introduction

This frivolous motion to strike some of Plaintiff's evidence on summary judgment is a product of Defendant's desperation to avoid a trial on the merits.  Faced with overwhelming evidence from which a reasonable jury could conclude that Ransome deliberately fabricated evidence, foreseeably resulting in Gell's conviction, *Washington v. Wilmore*, 407 F.3d 274, 282-83 (4th Cir. 2005), Ransome's only recourse is a series of meritless challenges to Plaintiff's properly presented evidence.  This is an exercise in futility, both because the challenges are baseless and because, even if each of the pieces of evidence to which Defendant objects were excluded, Plaintiff still has presented abundant evidence to demonstrate Ransome violated Plaintiff's civil rights.

## II.  Summary of Evidence At Issue

Plaintiff will not recount the general factual background, which is detailed in Plaintiff's Opposition to Summary Judgment.  (DE # 162.)  Plaintiff will describe in detail only the

1

testimony that Defendant has moved to strike. In sum, Defendant moves to strike the testimony

of six of the eight reinterviewed "last known alive" witnesses: Benjamin Parker, Larry Luke,

Robert Blowe, Paula Brabble, Janelle Harris and Peggy Moore.[1] He also moves to strike

testimony from Plaintiff's original trial attorneys, Charles Moore and Maynard Harrell. Despite

only making arguments applicable to small portions of this testimony, Defendant moves to strike

the affidavits of Robert Blowe, Paula Brabble, Janelle Harris, Jerry Waller and Charles Moore in

their entirety, as well as to strike the entire cross-examination portion of the depositions of

Benjamin Parker and Larry Luke.

### A. Reinterviewed "Last Known Alive" Witnesses

#### 1. Benjamin Parker

Mr. Parker was first interviewed by Defendant Ransome on April 18, 1995 and said he

had last seen Allen Ray Jenkins eight days before, on Monday, April 10, 1995, when Jenkins had

bought fish from him at his store. (DE # 164, Summ. J. Opp'n Ex. B, Parker 4/18/95.) In 2004,

Parker testified at Gell's retrial and again said that he had last seen Jenkins on Monday, April 10,

1995. (*Id.*, Parker trial 966-68.) He also described Ransome's July 28, 1995 reinterview of him:

> A. The first time they acted like professionals, from then on it went down hill. They told me I was wrong, that I could not be correct at all on the date and I was wrong, but I was not incorrect. It was the correct date.
> Q. It was the correct date?
> A. The 10th was the correct date.

---

[1] Ransome does not object to the admissibility of any of Mary Hunt's testimony. Mrs. Hunt testified at her deposition that during her July 28, 1995 reinterview, she told Ransome that she had last seen Jenkins on the Saturday before the body was found, which would be Saturday, April 8, 1995; Ransome recorded that she told him she had last seen Jenkins on Saturday, April 1, 1995. (DE # 163, Summ. J. Opp'n Ex. A.) This testimony, by itself, raises a legitimate issue of fact regarding the fabrication of evidence by Ransome.

2

(*Id.*, Parker trial 969.)  On cross examination by the prosecution, Parker testified:

> Q.   So if you told them that you weren't sure, the only thing you knew that it was a
>       Monday the first part of April, 1995 – If they wrote that down on the statement
>       then you're saying that would be wrong?
> A.   Yes, that would be wrong.
> Q.   That they wrote something down that you had not said?
> A.   They kept referring they wanted me to commit to the 3rd and I told them I could
>       not commit to the 3rd because I was almost one hundred percent sure it was the
>       10th and after going back and, you know, thinking about it and everything and
>       remembering everything, it was the 10th.  There were no ifs and ands about it.

(*Id.*, Parker trial 973.)  At Mr. Parker's deposition on April 10, 2007, which Defendant now

seeks to strike, he simply reiterated his trial testimony: that during the July 1995 reinterview

Ransome told him he had been wrong and that he must have seen Jenkins on the 3rd, but that

Parker insisted that he had last seen Jenkins on April 10th.  (*Id.*, Parker 104-09.)

### 2.   Larry Luke

Mr. Luke was first interviewed by Ransome on April 17, 1995 when he said he had last

seen Jenkins one week before, on Monday April 10, 1995, driving in his distinctive white

Camaro with blue stripes on the overpass in Ahoskie.  (DE # 165, Summ. J. Opp'n Ex. C, Luke

4/17/95.)  Luke testified at Gell's initial trial in 1998 that he had seen Jenkins on April 9 or 10,

1995, and that he knew it had not been the week before because when he learned of Jenkins'

death (on April 15, 1995) he had remarked that he had just seen Jenkins the previous Sunday.

(*Id.*, Luke trial I 2185-90.)  At the initial trial, Luke also described Ransome's July 28, 1995

reinterview of him during the cross examination by the prosecution:

> A.   Well, Dwight came over to my house, and I knew him from way back whenever
>       he was teaching school.  And he told me that I must have been mistaken on my
>       date.  And I said no, I'm pretty sure that was the date.  He said well, you must
>       have been mistaken he said, because he's been dead longer than that.  I said well,
>       maybe so.  But I saw him Sunday.
> Q.   Right.  So it's quite possible you saw him the Sunday before?

> A. I saw him – no, ma'am. I saw him the Sunday before he was found dead.
> Q. Which would have been April the 2nd?
> A. No, ma'am. Huh-uh (No.) It was April the 10th, April the 9th.

(*Id.*, Luke trial I 2190-91.)

Luke was reinterviewed by SBI Agent Nance on November 21, 2002, and told him he

had last seen Jenkins alive "just a couple of days or so before his body was found in his house."

(*Id.*, Luke 11/21/02.) Luke was reinterviewed again by SBI Agent Tilley on March 11, 2003 and

again said he had last seen Jenkins on Monday, April 10, 1995 and that he was pretty sure about

that date. (*Id.*, Luke 3/11/03.) Luke testified at Gell's retrial in 2004 that he had last seen

Jenkins on April 10, 1995, and that he had told this to Ransome when Ransome had

reinterviewed him in July, 1995. (*Id.*, Luke trial II 923-27.) Luke described the reinterview as

follows:

> Q. When they came and interviewed you, did they put any pressure on you or did
> they do anything other than just trying to do their job to find out what you knew?
> A. Well, not really, they just told me that I must have been confused on the date that
> I saw him, but I'm sure of the date I saw him.
> Q. Okay.
> A. You see they made a – one of the officers made a compliment [sic] about flies
> being on Allen Ray. . . . I'm not trying to down him in any way, but if y'all knew
> Allen Ray the way I know him you would understand why he had those seven day
> old flies on him.

(*Id.*, Luke trial II 930.) On cross-examination by the prosecution, Luke testified:

> Q. So did you tell these officers on the 28th of July, 1995, before Mr. Gell was
> charged with first degree murder that you did not know what date it was in April,
> 1995, that you saw Mr. Jenkins?
> A. No, sir, I was sure it was April 10th.
> Q. And you told them that?
> A. Yes.
> Q. And you're saying if they reported that you said something different, they are
> reporting something that's not true?
> A. I'm not saying they're not reporting – it might have been a slip of their mind, you
> know what I'm saying, but I did tell them it was April 10th when I saw Allen

4

Ray.

(*Id.*, Luke trial II 934-35.)  At his deposition on April 10, 2007, which Defendant seeks to strike, Luke merely reiterated that he had last seen Jenkins on April 10, 1995, and that was what he told Ransome on July 28, 1995.  (*Id.*, Luke 148-49.)  Luke also reiterated that at that reinterview Ransome told him he must have been mistaken because Jenkins "had been dead a couple of weeks" as demonstrated by the fly eggs found on his body, but that Luke told him again that he knew that he had seen Jenkins on April 10th.  (*Id.*, Luke 149-54.)

### 3.    Robert Blowe

Mr. Blowe was first interviewed on April 17, 1995, when he said he had last seen Jenkins on Monday, April 10, 1995, driving in his white Camaro with blue stripes in Ahoskie.  (DE # 166, Summ. J. Opp'n Ex. D, Blowe 4/17/95.)  Blowe testified at Mr. Gell's retrial in 2004 about his understanding of why he had been interviewed by law enforcement about Jenkins's death:

> Well, I had made a statement in a country store in Millenium that – I said I heard he had got killed.  I said, well, you know, *it hadn't been a week that I had seen the man*, just in general conversation.

(*Id.*, Blowe trial 910-14.)  Blowe testified that this is what he told law enforcement officers when he was interviewed in April and again when he was reinterviewed in July, 1995: "I just basically told them the same, *the only thing that I knew I hadn't been a week seen the man and then I heard he was murdered.*"  (*Id.*, Blowe trial 915.)  On cross examination, Blowe was questioned whether he had told Ransome on July 28, 1995 that he was not sure of the date he had last seen Jenkins, but was sure it was on a Monday in the first part of April: "Well, I just – I couldn't be positive of a date because, you know, I don't really pay attention to the calendar, *but I do know it was within a week that I seen the man alive.*"  (*Id.*, Blowe trial 918.)

5

On December 18, 2007, Blowe gave an affidavit (*Id.*, Blowe 12/18/07) which Defendant

now moves to strike on the ground that it "contradict[s] and conflict[s] with significant aspects

of [his] prior sworn testimony." (DE # 218 at 8.)  Referring to the affidavit obtained earlier by

Ransome's attorneys, Blowe said on December 18 that he had spoken briefly to one of

Ransome's attorneys on the phone, who then mailed him some papers which he read briefly,

signed and mailed back.  (*Id.*)  Blowe then described his memory of when he had last seen

Jenkins and the law enforcement interviews of him on this topic:

> I know the police came to see me the first time because *I had told someone in a store in Millenium that it hadn't been a week before Jenkins was found that I had seen the man.* When the police first came to see me, I couldn't give them a date, but *I told them it was less than a week before they found the body.*  When they came back to see me a second time after that, I just basically told them the same.  That I couldn't be positive of a date because I don't really pay attention to the calendar, but *I knew it hadn't been a week since I seen the man and then I heard he was murdered. . . .*  I took another look at the report the police wrote back in July 1995.  I see that it doesn't say anything about me saying that it hadn't been a week that I had seen Jenkins before his body was found.  I don't know why they didn't put that in there.

(*Id.*)  Far from contradicting and conflicting with his prior sworn testimony, Mr. Blowe's

affidavit accurately summarizes what he testified to, under oath, during both direct and cross

examination in 2004.

### 4.    Paula Brabble

Ms. Brabble was first interviewed by Ransome on April 25, 1995, when she said she

remembered seeing Jenkins at the Golden Skillet restaurant on April 10, 1995.  (DE # 167,

Summ. J. Opp'n Ex. E, Brabble 4/25/95.)  Ms. Brabble testified at Mr. Gell's retrial in 2004 that

when she was first interviewed by the SBI, *she told them she had last seen Jenkins on April 10,*

*1995.*  (*Id.*, Brabble trial 886-87.)  Brabble also described Ransome's July 28, 1995 reinterview

of her:

6

Q.	Now, three months later, did the agents come back to talk with you again?
A.	Yes, I do believe.
Q.	And what happened when they came back out?
A.	*They came back out and they said that the dates could have been messed up or whatever* and do I remember recalling any other date or anything and I told them I couldn't really remember, you know. *My most accurate would be the first time I talked to anyone.*
Q.	*They told you the dates were messed up?*
A.	*Yes, it was something to that matter, that when they found him it couldn't be possible,* this and that and whatever.

(*Id.*, Brabble trial 888.) On December 18, 2007, Brabble gave an affidavit (which Defendant now moves to strike for being in conflict with her prior sworn testimony) reaffirming this trial testimony. (*Id.*, Brabble 12/18/07.) Brabble also described Ransome's July 1995 reinterview of her:

> After the first interview, the police came back out and *said that the dates I told them could have been messed up, something about that when they found him, the date I had said couldn't be possible.* I can't remember the exact words they used, but it was something like that, or close. I also remember they said something about maggots showing it was earlier than I said. I can't tell you exactly what I said when they told me that. It's just too long ago. I don't remember. *But like I testified, I told them I couldn't really remember the date, but my most accurate would be the first time I talked to anyone.*

(*Id.*) Brabble explained that while she had signed an affidavit for Ransome's lawyers in May 2007, she had not written the affidavit, and that it was not true to say that she could "fully verify the accuracy" of the report Ransome prepared of his July 1995 reinterview of her, since it omitted any mention of the maggots, Ransome telling her her date was messed up, or Brabble telling Ransome that her most accurate memory was the first time they talked to her. (*Id.*) [2]

---

[2]  If anyone has attempted to create facts that are inconsistent with prior testimony, it is the Defendant, whose affidavits – obviously drafted by lawyers with vague and conclusory language buried in pages of legalese – attempt to contradict what Blowe and Brabble previously testified to under oath and subject to cross examination, and what Harris and Moore previously told SBI agents in 2003 and 2003.

### 5. Janelle Harris

Janelle Harris was first interviewed by Ransome on May 8, 1995, and said she had last seen Jenkins when he bought gas from her Red Apple store in Ahoskie on the Monday before his body was found, which would be Monday, April 10, 1995.  (DE # 168, Summ. J. Opp'n Ex. F, Harris 5/8/95.)  Harris testified at Gell's initial trial, in 1998, that although she was terrible with dates, it "*couldn't have been more than one week*" before she heard about Jenkins' death that she had last seen him alive.  (*Id.*, Harris trial 2194.)  On November 26, 2002, Harris was reinterviewed by SBI Special Agent W.E. Brown and told him that she thought she had seen Jenkins alive "*a couple of days after they said he was killed,*" which was a couple of days before he was found dead.  (*Id.*, Harris 11/26/03.)

On December 18, 2007, Harris gave an affidavit.  (*Id.*, Harris 12/18/07.)  Referring to the affidavit obtained by Ransome's lawyers, Harris explained that she had only spoken with the lawyers for a few minutes, and that while she had signed the affidavit, she had not written it. (*Id.*)  She also explained that "I can't say exactly what I told any particular police officer, so I don't know whether the reports they wrote had everything they said or not.  I can't say whether the reports the police wrote are accurate or not."  (*Id.*)  Finally, Harris described, to the best of her recollection, her memory of learning of Jenkins' death and her interactions with law enforcement:

> I do remember that when I heard he was found dead, I was surprised because it didn't seem possible.  I told someone I had just seen him the other day.  *It couldn't have been more than week before they found him.  That's what I told people when they asked me about it, since I'm not good with dates.*

(*Id.*)  Once again, this simply reiterates what Harris testified to under oath in 1998, and what she told SBI Agent Brown in 2002.  In no way does it contradict or conflict with her prior testimony.

8

### 6. Peggy Moore

Ms. Moore was first interviewed by Ransome on May 8, 1995 and stated that she had served Jenkins at the Golden Skillet restaurant in Ahoskie on Monday, April 10, 1995. (DE # 169, Summ. J. Opp'n Ex. G, Moore 5/8/95.) Moore was reinterviewed on November 22, 2002 by SBI Special Agent Nance and told him that she remembered Jenkins coming into the Golden Skillet *a few days before his body was found on April 14, 1995.* (*Id.*, Moore 11/22/02.) On March 11, 2003, Moore was reinterviewed by SBI Special Agent Warner, and reaffirmed that she thought she had last seen Jenkins on April 10, 1995, but was not sure. (*Id.*, Moore 3/11/03.)

On December 18, 2007, investigator Jerry Waller was present for an interview of Peggy Moore. (*Id.*, Waller 1/24/08.) Ms. Moore stated that she could not remember exactly what any law enforcement officers had said to her or what she had said to them concerning when she had last seen Jenkins alive. (*Id.*) Ms. Moore further stated, consistent with what she had previously told SBI Agent Nance in 2002 and SBI Agent Warner in 2003, that she did remember that when she heard of Jenkins' body being found, she remembered having seen him at the Golden Skillet *just a few days beforehand, and that that is what she believed she had told everyone who asked her.* (*Id.*) Referring to the affidavit given to Ransome's lawyers, Ms. Moore said that while she had signed it, she had not written it; Ms. Moore also said that she could not verify that Ransome's reports were accurate. (*Id.*) Finally, Ms. Moore stated that she did not want to sign another affidavit. (*Id.*)

### B. Other Witnesses

### 1. Charles Moore

Mr. Moore was one of Mr. Gell's attorneys at the first trial. (DE # 178, Summ. J. Opp'n

Ex. P, C. Moore 1/24/08.)  He was deposed by Ransome on October 4, 2007 about his role as

one of Gell's attorneys, including the investigative steps he took after they received the interview

and reinterview reports from eight of the "last known alive" witnesses.  (*Id.*)  Mr. Moore gave an

affidavit on January 24, 2008, describing an interaction he had with Ransome during Mr. Gell's

first trial, after Mr. Moore had interviewed Linwood Rawls:

> The next day at trial I saw Linwood at the courthouse.  A little while later, Dwight
> Ransome stopped me.  Dwight got very close to me, he was in my face, pointing his
> finger at me, and told me in a loud voice "you are going to stop harassing my witnesses,
> they don't want to talk to you, and they don't have to talk to you!"  I asked Dwight if he
> was referring to Linwood.  Dwight said, "you are going to stop this or you are going to
> pay a price!"  Dwight was aggressive and threatening to me.  I felt he was trying to
> intimidate me into not speaking to these witnesses.

(*Id.*).

### 2. Maynard Harrell

Mr. Harrell was the other of Mr. Gell's attorneys at the first trial; he was deposed by

Ransome on July 19, 2007.  (DE # 179, Summ. J. Opp'n Ex. Q.)  At his deposition, Mr. Harrell

described an interaction he had with Ransome during Mr. Gell's retrial, in 2004:

> A.   I don't remember what I directly said to him, whether it was, like, "Hey, Dwight,"
>       or "How is it going" or – I don't recall what I said to him.  I recall his response to
>       me. . . .  He said to me, "We're going to kick their ass just like we kicked yours."
> Q.   Okay.  And was he joking around?  Was he – what was his demeanor when he
>       was doing that?
> A.   He just made that statement to me.
> Q.   Okay.  Did he look angry or mad when he said it?
> A.   I don't recall at this time.
> Q.   Okay.
> A.   But I – I mean, it evidently had some effect, because I – because like I said, I just
>       quoted what he said to me.

(*Id.*, Harrell 134-35.)

### III. Argument

#### A. Legal standard

"[T]he summary judgment procedure allows the court to forecast the proof at trial to determine whether consequential facts are in dispute, and if not, to resolve the case without a trial." *Mitchell v. Data General Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993). "The papers of a party opposing summary judgment are usually held to a less exacting standard than those of the moving party," *Richardson v. Oldham*, 12 F.3d 1373, 1378 n.17 (5th Cir. 1994); *Volumetrics Medical Imaging, Inc. v. ATL Ultrasound, Inc.*, 243 F. Supp. 2d 386, 397 (M.D.N.C. 2003), and "the nonmoving party . . . [need not] produce evidence in a form that would be admissible at trial in order to avoid summary judgment," *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). To strike an affidavit in its entirety, the opposing party must show that no part of the information contained in the affidavit is admissible. *See Perez v. Volvo Car Corp.*, 247 F.3d 303, 315 (1st Cir. 2001) (Rule 56(e) "requires a scalpel, not a butcher knife. The . . . court ordinarily must apply it to each segment of an affidavit, not to the affidavit as a whole."). As the non-movant, Gell is entitled "to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, all internal conflicts in it resolved favorably to him, [and] the most favorable of possible alternative inferences from it drawn in his behalf." *Overstreet v. Kentucky Cent. Life Ins. Co.*, 950 F.2d 931, 937 (4th Cir. 1991) (quoting *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)).

#### B. Deposition Testimony of Parker and Luke is Admissible

Ransome has moved to strike the deposition testimony of Luke and Parker because some of it was given in response to leading questions, posed by plaintiff's counsel on cross-

11

examination. The entire premise of Ransome's argument is that Parker and Luke are allegedly "identified with" Plaintiff and "adverse" to Defendant because in previous trials, under oath and subject to cross examination, they gave testimony "generally unfavorable (adverse) to Defendant Ransome and generally favorable (friendly) to Plaintiff." (DE # 218 at 15.) This is a complete distortion of their role in the case as well as the legal definition of an "adverse witness."

Neither Parker nor Luke qualifies as "a hostile witness, an adverse party, or a witness identified with an adverse party" to Defendant Ransome under Rule 611(c) of the Federal Rules of Evidence. *See Vanemmerik v. The Ground Round, Inc.*, No. CIV.A. 97-5923, 1998 WL 474106, *1 (E.D. Pa. Jul. 16, 1998) (unpublished) ("The normal sense of a person 'identified with an adverse party' has come to mean, in general, an employee, agent, friend, or relative of an adverse party.") (collecting cases). Parker and Luke were witnesses discovered by the Defendant during the initial canvass. Parker simply owned a local fish store that the SBI went to in their search for the source of the herring found on the stove at the victim's house. He remembered seeing Jenkins on Monday, April 10, when Jenkins bought the herring from him, and told the SBI that simple fact. Luke was a longstanding co-worker and friend of Jenkins, who happened to see Jenkins driving his distinctive car in Ahoskie on the same day, Monday, April 10. Parker did not know Luke, Luke did not know Parker, and neither knew Gell. They testified, as completely disinterested citizen witnesses, to the truth. The fact that their testimony turns out to be unfavorable to Ransome in this suit does not make them adverse to him in a legal sense, anymore than the fact that their testimony corroborates the allegations made by Plaintiff makes them witnesses who are "identified with" Plaintiff.

The same is true of all eight of the reinterviewed "last known alive" witnesses, and

indeed of all seventeen witnesses who reported having seen Jenkins alive after April 3, 1995. None of these "last known alive" witnesses even know Plaintiff Gell, let alone are an "employee, agent, friend or relative" of his. (*See* DE # 183, Summ. J. Opp'n Ex. U, Tilley 140-41.) They are uninvolved, average citizens, who have been dragged into this matter because Ransome fabricated reports of what they said. All they have attempted to do is tell the truth, throughout repeated involvement in the investigation over many years. They are as disinterested as witnesses can possibly be, and are neither identified with nor adverse to either party. As the First Circuit noted in *Suarez Matos v. Ashford Presbyterian Community Hosp., Inc.* 4 F.3d 47, 50 (1st Cir. 1993): "We find no case . . . suggesting that simply because a party expects favorable testimony from a witness, the opponent is entitled to call him, or her, as hostile. If a party proposes to call a happenstance witness to an accident, does that mean the other can call him and cross-examine?" The answer is clearly no.[3] Since neither Luke nor Parker qualifies as a hostile or adverse witness under Rule 611(c), there was no "role reversal," and plaintiff's questions on cross-examination – even to the extent they were leading – were entirely proper.

Further, even if Luke and Parker *could* be correctly characterized as hostile or adverse witnesses, that would still not make plaintiff's cross-examination of these witnesses by leading

---

[3] In *LaSalle Nat. Bank v. Massachusetts Bay Ins. Co.*, No. 90 C 2005, 1997 WL 24677, *4 (N.D. Ill. Jan. 17,1997) (unpublished), that court made the same point:

> In this case, the fire marshals are not parties to the lawsuit, so they cannot possibly be "adverse parties." They have no apparent relationship or connection to the defendant insurance companies (apart from their testimony in this lawsuit), so they are not "identified with an adverse party" in the normal sense of being an employee, agent, friend, or relative of an adverse party. The only indication that the fire marshals are "hostile witnesses" is that they have stated opinions on an important issue that contradict the opinions of plaintiffs. However, expressing a contrary view does not in an of itself make a witness "hostile" under Rule 611(c). If it did, nearly every witness in every lawsuit could be treated as "hostile."

13

questions improper. *See United States v. Oladokun*, No. 97-4569,166 F.3d 336 (4th Cir. Nov. 19, 1998) (unpublished) (Court properly allowed government to use leading questions on cross-examination of government agent defendant had called as an adverse witness). In neither of the cases Defendant cites did a court strike similar testimony. *McCardle v. Mitchell School Dist.*, No. 03-4092, 2005 WL 1118154, *2 (D.S.D. May 11, 2005) (unpublished) (declining to strike deposition testimony obtained through leading questions); *Morales-Arcadio v. Shannon Produce Farms, Inc.*, No. 605CV062, 2007 WL 2106188, *11 (S.D. Ga. Jul. 18, 2007) (unpublished) (striking portion of deposition testimony of defendant's employee in response to leading questions from defense counsel, while noting that the witness had testified to the same facts in other places, so that the motion had no effect on the summary judgment record).

Finally, even if the Court were to strike all of the testimony of Parker and Luke made in response to leading questions, that would not affect the facts before the Court on summary judgment. First, Parker's key deposition testimony was not given in response to leading questions.[4] Second, each has testified before under oath – Parker once, Luke twice – to the same facts. (DE # 164, Summ. J. Opp'n Ex. B, Parker trial; DE # 165, Summ. J. Opp'n Ex. C, Luke trial I and II.)

---

[4] The key section of Parker's deposition testimony concerning the July 28, 1995 reinterview is as follows:

    Q.    What do you remember [Ransome] telling you about the death of Allen Ray Jenkins and – and what your prior statement had been?

    A.    He told me my original date was – was incorrect. I was wrong. He had not been killed on the 10th. He'd been killed on the 3rd, and I knew it could not have been because it was – I mean, I knew all the details on it. I knew it was the week before I had seen the man and sold him the fish.

    Q.    And did you tell him that?

    A.    Yes.

(DE # 164, Summ. J. Opp'n Ex. B, Parker 105.)

### C. Affidavits of Blowe, Brabble and Harris are Admissible

#### 1. The Affiants are Competent to Testify

"[E]very witness is presumed to be competent." *United States v. Odom*, 736 F.2d 104,

112 (4th Cir. 1984). There is no requirement that the affidavit itself state that the witness "is

over 18 years of age, and not suffering under any physical or mental disability, which in any way

impairs the affiant's ability to recall or state the facts set forth in the Affidavit," DE # 218 at 10;

Fed. R. Civ. P. 56(e); *see Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.*, 831 F.2d 77, 80

(5th Cir. 1987). Nor is there any real dispute about the witnesses' competence. Defendant

obtained his own affidavits from Blowe, Brabble and Harris and so well knows that they are each

over 18 and competent to testify. The witnesses' honest indications that their memories are

imperfect about the precise details of everything that occurred does not disqualify their

testimony.[5]

Just as clearly, the affidavits' substance falls within the personal knowledge of the

affiants: the subject of each affidavit is events that happened to each affiant and things the affiant

did. *See, e.g., HomeBingo Network, Inc. v. Chayevsky*, 428 F. Supp. 2d 1232, 1239 (S.D. Ala.

2006) ("[T]he personal knowledge requirement is plainly satisfied . . . [where] the affiant

describes a meeting that he personally attended."). Nor does the fact that Robert Blowe

---

[5] If it did, Ransome's entire testimony in his own defense should be struck, as he has not only "forgotten" but claimed that significant elements of the investigation – such as the polygraph of Gary Scott and the pretrial meeting with Crystal Morris – never happened, and then been forced to acknowledge his error when presented with objective evidence. Compare DE # 172, Summ. J. Opp'n Ex. J, Ransome I 149-53 with *id.*, Ransome II 35-39 (Gary Scott polygraph); compare *id.*, Ransome III 33-34, with *id.*, Ransome IV 11 (Crystal Morris meeting). It is fortunate for Ransome that the test he now advocates is not the law.

reviewed his own prior sworn testimony undermine his personal knowledge. *See Optical Cable Corp. v. Massachusetts Elec. Const. Co.*, 21 F. Supp. 2d 582, 588 (W.D. Va. 1998) ("An affiant may use documents to refresh his recollection. The use of such documents does not mean that an affiant lacks personal knowledge.")[6]

Even less persuasive are the semantic objections Defendant raises: that Blowe refers to SBI Investigator Ransome as "the police" or that he describes a report as "saying" something. (DE # 218 at 11-12.) Simply, those linguistic squabbles provide absolutely no justification for striking any of Blowe's testimony. Similarly, Blowe's testimony "I don't know why they didn't put that in there" is a summary of admissible factual testimony: that Blowe told Ransome that "it hadn't been a week since he last saw Jenkins when he found out he was killed" and that he did not tell or otherwise indicate to Ransome that that information should not be included in Ransome's report. *See Volumetrics Medical Imaging, Inc. v. ATL Ultrasound, Inc.*, 243 F. Supp. 2d 386, 396-97 (M.D.N.C. 2003) (rejecting similar semantic objections to the admissibility of summary judgment affidavits).

### 2. The Affidavits Are Not "Shams"

The first problem with Ransome's allegation that the affidavits from Blowe, Brabble and Harris are "shams" is that the "sham" affidavit rule only applies to parties or people closely identified with parties. *See Hernandez v. Trawler Miss Vertie Mae, Inc.*, 187 F.3d 432, 438 (4th Cir. 1999) (party); *Van T. Junkins & Assocs. v. U.S. Indus.*, 736 F.2d 656, 656 (11th Cir. 1984)

---

[6] Even if Blowe's affidavit testimony were interpreted to indicate that he had no present memory of how he testified at Gell's 2004 trial, that would just make his prior trial testimony admissible evidence under Rule 803(5) of the Federal Rules of Evidence as a past recorded recollection.

(party); *Rohrbough v. Wyeth Laboratories, Inc.*, 916 F.2d 970, 976 (4th Cir. 1990) (expert

witness); *Anchor Wall Systems, Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1314

(Fed. Cir. 2003) (expert witness); *Ramsey Group, Inc. v. EGS Intern., Inc.*, 329 F. Supp. 2d 630,

638 (W.D.N.C. 2004) (expert witness); *Galvin v. Eli Lilly & Co.*, No. Civ.A. 03-1797 CKK,

2005 WL 3272142 at *2 (D.D.C. Sept. 12, 2005) (unpublished) (party's mother);[7] *see also*

*Volumetrics Medical Imaging, Inc. v. ATL Ultrasound, Inc.*, 243 F. Supp. 2d 386, 395 (M.D.N.C.

2003) (refusing to strike affidavit from plaintiff company's principal investor because court

found it did not flatly contradict his deposition but rather clarified or augmented his prior

testimony).   Here, the witnesses at issue are uninterested parties, not identified with either side.

    Further, the detailed history of each witnesses' prior statements, recounted *supra*,

demonstrates plaintiff's affidavits are nothing close to shams.  The affidavits given to Plaintiff

all recount essentially the same information as what these witnesses said at trial and in prior

statements to the SBI, and, in fact, closely track the initial statements they gave to Ransome in

April and May 1995.  If anything is a "sham" it would be the affidavits defense counsel obtained

---

[7] Although the court in *Galvin* also struck part of the plaintiff's pharmacist's affidavit, that was because of a discovery violation, rather than the "sham" affidavit rule. *Galvin*, 2005 WL 3272142 at *2.  The quote from *Galvin* that Ransome includes in his brief – concerning surprising the other party with new evidence after the close of discovery – applies better to Ransome's behavior than Plaintiff's.  All of the earlier testimony and SBI statements of the "last known alive" witnesses – which, as detailed above, say essentially the same thing as plaintiff's affidavits – were provided to Defendant during discovery.  In contrast, Defendant obtained affidavits from Blowe, Brabble, Harris and Moore – some apparently months before discovery closed – but he never turned them over to Plaintiff, as required by his ongoing discovery obligations under Rule 26(a)(1)(A)(ii), until he filed for summary judgment.  Defendant himself characterizes the affidavits he obtained as "diametrically opposed" to the witnesses' prior and subsequent statements.  (DE # 218 at 8-9.)  The affidavits Plaintiff obtained merely reaffirm the witnesses' earlier sworn testimony and demonstrate that Defendant mischaracterizes the significance of the affidavits he got the witnesses to sign.

17

from these witnesses. It is Defendant's affidavits that contradict the witnesses' prior sworn testimony, at least if they are interpreted the way that Defendant advocates. It is Defendant's affidavits – in dense legalese, not the language of the affiants – that contravene the rule that generally, a summary judgment affidavit "must present evidence in substantially the same form as if the affiant were testifying in court." *Evans v. Technologies Applications & Service Co.*, 80 F.3d 954, 962 (4th Cir. 1996).[8]

In the end, the dispute over the various affidavits does not matter at this stage, as these witnesses have previously given the same testimony as in the affidavits Plaintiff obtained.. This makes any contradictions among the affidavits and prior testimony and statements a question of witness credibility, which the Court cannot assess on summary judgment. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006). For the purposes of summary judgment, to the extent there's a conflict between affidavit testimony and deposition or trial testimony, the evidence must be viewed in the light most favorable to Plaintiff, as the non-movant. *Doe v. Kidd*, 501 F.3d 348, 353 (4th Cir. 2007).

**D.     Affidavit of Waller is Admissible**

Plaintiff does not dispute that, despite verbally affirming that the contents of the draft affidavit were true, Ms. Moore did not sign the draft affidavit. However, the affidavit is properly included in the record as an exhibit to Jerry Waller's affidavit and an illustration of his own testimony. As with any other affidavit, the contents of Mr. Waller's affidavit may be considered

---

[8] While plaintiff does not accuse defense counsel of acting improperly in obtaining these affidavits, he submits that, given the circumstances under which they were obtained, and the witnesses prior statements under oath and to other SBI agents, these affidavits can hardly be taken as a fair representation of how the witnesses will testify at trial.

18

to the extent they represent facts that would be admissible in evidence.  Fed. R. Civ. P. 56(e).

At trial, if Ms. Moore were to testify as represented by the affidavit defense counsel obtained from her,[9] Waller's testimony concerning what Ms. Moore told him would be admissible as extrinsic evidence of a prior inconsistent statement under Rule 613(b) of the Federal Rules of Evidence.  Waller's affidavit can thus be considered on summary judgment for the same purpose – as impeachment of the October, 2007 affidavit.

Defendant moves to strike "all attachments and exhibits" to Ms. Moore's draft affidavit. (DE # 218 at 6.)  However, those same exhibits – Ms. Moore's four statements to the SBI concerning her last sighting of Allen Ray Jenkins – are already part of the summary judgment record, as exhibits to the affidavit Ms. Moore provided to defense counsel.  (DE # 88 at 7-11.) Further, in that affidavit, Ms. Moore reaffirmed the truth and accuracy of the statements she had given to the SBI in 2002 and 2003, including that Moore thought she had seen Jenkins only a few days before his body was found, on what she believed to have been on April 10, 1995, although she was not sure of the date.  (DE # 88 at 5.)

The only new information that Moore relayed to Waller is: 1) Moore did not write the affidavit she signed for defense counsel (which, in any event, is plain from the face of that affidavit); 2) Moore does not remember exactly what she said to Ransome in 1995, or what he said to her, and therefore cannot "fully verify the accuracy" of his report; and 3) Moore believes she told everyone who asked her that she had last seen Jenkins at the Golden Skillet a few days before his body was found.  As explained above, all of this testimony would be admissible,

_____

[9] Plaintiff expects Ms. Moore to testify truthfully at trial to the facts that she previously told SBI agents in 2002 and 2003, and that she represented to Mr. Waller were true.

through Waller, to impeach Moore at trial (if she were to testify, as Defendant represents, in accordance with the October, 2007 affidavit).

Waller's affidavit may also be considered under Rule 56(f), which provides:

> If a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) deny the motion; (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or (3) issue any other just order.

Fed. R. Civ. P. 56(f). Plaintiff does not contend that he cannot present facts essential to justify his opposition; as demonstrated in Plaintiff's Memorandum in Opposition to Summary Judgment, along with the 31 accompanying exhibits, Plaintiff has presented more than sufficient evidence from which a reasonable jury could find Ransome violated his civil rights. (*See* DE ## 162-93.) However, through the Waller affidavit Plaintiff has presented specified reasons why he cannot present an affidavit from Peggy Moore: namely, that she was unwilling to sign one, even to facts she admitted were all true, and Plaintiff has no means to compel her to sign an affidavit. Further, Plaintiff was granted 15 depositions in this matter (including expert depositions) (DE # 54 at 2), and used all of them and Defendant indicated his intention to object to any depositions beyond that limit. Finally, since Defendant did not provide a copy of the affidavit he obtained until he filed his motion for summary judgment, Plaintiff did not have an opportunity while discovery was ongoing to seek leave for additional discovery. Again, Plaintiff does not believe additional testimony from Peggy Moore is necessary to support Plaintiff's opposition to summary judgment, but if the Court finds otherwise, Plaintiff respectfully requests appropriate relief under Rule 56(f), including denial of Defendant's motion for summary judgment or leave to conduct a deposition of Peggy Moore.

### E.    Evidence from Charles Moore and Harrell is Admissible

Defendant's final objection to Plaintiff's proffered summary judgment evidence is that testimony from Charles Moore and Maynard Harrell should be excluded *from the Court's consideration* as substantially more prejudicial than probative under Rule 403.[10]  This testimony is squarely relevant.  As explained in detail in Plaintiff's Opposition to Ransome's Motion for Summary Judgment (DE # 162 at 14-23), Plaintiff must prove that Ransome deliberately fabricated evidence: i.e., that the material differences between what witnesses told him and what he wrote down were intentional.  Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.  Since the evidence from Moore and Harrell tends to make it more likely that Ransome fabricated evidence against Gell, it is relevant and admissible.

Ransome's claim that Moore's testimony "Dwight was aggressive and threatening to me. I felt he was trying to intimidate me into not speaking to these witnesses" is conjecture is meritless – this is clearly admissible factual testimony, including lay opinion testimony, admissible under Rule 701 – which Ransome is free to rebut or attempt to explain away at trial. Furthermore, this incident is extremely probative.  Moore describes Ransome attempting to intimidate Moore from speaking to what Ransome termed "my witnesses," which in context included each of the reinterviewed witnesses whose reports had been disclosed to Gell's attorneys the day before.  The jury may reason from this evidence that Ransome was trying to

---

[10]  Ransome also objects that Moore's affidavit does not state that he is over 18 and competent to testify, however, Ransome, who deposed Moore, well knows Moore is competent.

prevent Gell's attorneys from interviewing these witnesses precisely because he knew what the witnesses had said differed from what he had written down. *See United States v. Young*, 248 F.3d 260, 271-72 (4th Cir. 2001) (evidence that a defendant has intimidated a witness is probative evidence of guilt).

Ransome claims that Plaintiff cannot prove intentional fabrication because "had no such motive and needed no such motive." (DE # 84 at 9 (in bold and italics in original).) The Harrell testimony indicates Ransome had a strong desire to see Gell convicted, and is therefore probative evidence that Ransome intentionally fabricated the reinterview reports. *Cf. Mullen v. Princess Anne Volunteer Fire Co., Inc.*, 853 F.2d 1130, 1133 (4th Cir. 1988) ("Where a plaintiff seeks to prove discriminatory intent, the probative value of statements revealing the racial attitudes of the decisionmaker is great. This is so because of the inherent difficulty of proving state of mind."). Ransome claims this incident is "ambiguous" but he is free to offer his own explanation at trial. That the Harrell encounter was several years removed from the initial incidents does nothing to lessen its probative value – if anything, the fact that Ransome remained so invested so many years later makes the evidence even more probative of Ransome's motive to ensure Gell's conviction.

Most importantly, Ransome offers not even the slightest explanation of how this testimony by Moore and Harrell *unfairly* prejudices him before the Court. Ransome has exhibited a pattern of claiming that any evidence that hurts his case "unfairly" prejudices him. This is a complete misunderstanding of Rule 403. *See Mullen v. Princess Anne Volunteer Fire Co., Inc.*, 853 F.2d 1130, 1134 (4th Cir. 1988) ("All relevant evidence is 'prejudicial' in the sense that it may prejudice the party against whom it is admitted. Rule 403, however, is

22

concerned only with 'unfair' prejudice."). Certainly this evidence hurts Ransome's case, because it is probative evidence that he intentionally fabricated evidence against Gell. However, there is absolutely nothing "unfair" about this prejudice, as would be required to bar this testimony. *Westfield Ins. Co. v. Harris*, 134 F.3d 608, 615 (4th Cir. 1998) ("Prejudice under Federal Rule of Evidence 403 is certainly not established from the mere fact that the evidence is highly probative.").[11]

## IV.    Conclusion

For the foregoing reasons, Ransome's Motion to Strike Affidavit and Deposition Testimony should be denied.

Dated: February 27, 2008              Respectfully submitted,

                                      ALAN GELL

                                      By:__/s/ David Rudolf_____
                                      David S. Rudolf, Esq. (NCSB# 8587)
                                      RUDOLF WIDENHOUSE & FIALKO
                                      1800 Camden Road, Suite 105
                                      Charlotte, NC 28203
                                      Tel.: 704-333-9945 / Fax.: 704-335-0224
                                      dsrudolf@aol.com

                                      Barry C. Scheck, Esq. (BS4612)
                                      Anna Benvenutti Hoffmann, Esq. (AH4008)
                                      COCHRAN NEUFELD & SCHECK LLP
                                      99 Hudson St., 8th Floor
                                      New York, NY 10013
                                      Tel. (212) 965-9081 / Fax. (212) 965-9084

---

[11] It is not even clear whether the Court may apply Rule 403 at the summary judgment stage, *see Schultz v. Butcher*, 24 F.3d 626, 632 (4th Cir. 1994) (holding district court erred in applying Rule 403 in the context of a bench trial, since the court is capable of rejecting any improper inferences from relevant evidence), and Defendant has not cited any cases in support of that request.

23

## CERTIFICATE OF SERVICE

I hereby certify that on February 27, 2008, I electronically filed the foregoing Memorandum in Opposition to Defendant's Motion to Strike Affidavit and Deposition Testimony with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following: Gary H. Clemmons, Susan P. Ellis, Barry Scheck, and Anna Benvenutti Hoffmann.

Respectfully submitted this the 27th day of February, 2008.

By:__/s/ David Rudolf_____
David S. Rudolf, Esq. (NCSB# 8587)
RUDOLF WIDENHOUSE & FIALKO
1800 Camden Road, Suite 105
Charlotte, NC 28203
Tel.: 704-333-9945 / Fax.: 704-335-0224
dsrudolf@aol.com