IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION
2:05-CV-21-FL

| | | |
|---|---|---|
| JAMES ALAN GELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| TOWN OF AULANDER, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

This case comes before the court on two motions to exclude expert testimony: the motion by plaintiff James Alan Gell ("Gell") to exclude the expert testimony of Isaac Avery ("Avery") (DE #122), and the motion by sole-remaining defendant Dwight L. Ransome ("Ransome") to exclude the expert testimony of Craig W. Haney ("Haney") (DE #195). The motions were referred to the undersigned for a memorandum and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B), by order of the presiding Chief District Judge (DE #245). The motions have been fully briefed[1] and a hearing on them was held on 14 November 2008. For the reasons that follow, the court will recommend that both motions be granted in part and denied in part.

These recommendations and the underlying analysis are, of course, based on the record as it currently stands. They are therefore subject to further development of the record in proceedings before and during trial, and the authority of the presiding Chief District Judge over such proceedings.

---

[1] Ransome filed a memorandum of law in opposition to the motion to exclude Avery (DE #159). Gell filed a memorandum of law in opposition to the motion to exclude Haney (DE #234) and Ransome filed a reply brief (DE #236). Gell thereafter filed a motion for leave to submit a surreply (DE #238), which Ransome opposed (DE #240), but was allowed by the court (DE #250).

## BACKGROUND

Gell commenced this lawsuit alleging violations of his federal constitutional and North Carolina state law rights. (*See generally* Compl. (DE #1)). He alleges that he was wrongfully arrested, prosecuted, convicted, and sentenced to death for the murder of Allen Ray Jenkins. (*Id.* ¶ 18). Gell spent nine years in prison—half of them on death row—before being re-tried and acquitted of the crime. (*Id.* ¶ 1). Ransome was a North Carolina State Bureau of Investigation ("SBI") Special Agent who served as the lead investigator in the investigation of Jenkins's murder. (*Id.* ¶¶ 10, 19).

Jenkins was found murdered in his Aulander, North Carolina home on 14 April 1995. (*Id.* ¶ 17). Because Gell was out of the state or in jail each day after 3 April 1995 through 14 April 1995, the case against him depended on the prosecution establishing that Jenkins was killed on 3 April 1995. (*Id.* ¶ 34). Ransome and other investigators collectively took statements from several individuals who claimed to have seen Jenkins alive after 3 April 1995, but Gell alleges that this information was not shared with Gell or his attorneys before trial. (*Id.* ¶¶ 35, 42). Gell maintains that after Ransome learned that Gell could have only committed the murder on 3 April 1995, Ransome participated in re-interviews of many of these witnesses in an attempt to alter the witnesses' initial exculpatory statements and replace them with false statements or memories consistent with the prosecution's theory of the case against Gell. (*Id.* ¶ 47). Gell further alleges that, despite the fact that some of the witnesses continued to insist that they saw Jenkins alive after 3 April 1995, Ransome prepared re-interview reports which indicated that every witness recanted his or her earlier statement about seeing Jenkins alive after 3 April 1995 or was no longer sure of the exact date he or she last saw Jenkins. (*Id.* ¶ 52).

2

In short, Gell claims that Ransome, as the lead investigator on the case, fabricated inculpatory evidence, ignored impeachment evidence that was inconsistent with the prosecution's theory of the case, and failed to develop leads that could have exonerated Gell. As a result of his wrongful imprisonment, Gell alleges that he sustained numerous injuries and damages, including but not limited to pain and suffering, severe mental anguish, and emotional distress. (*Id.* ¶ 3). Ransome denies any wrongdoing and maintains that his actions were lawful and appropriate, and were taken in the reasonable belief that his actions were authorized and in accordance with the law. (*See generally* Def.'s Ans. (DE #49)).

## DISCUSSION

### I.    STANDARD FOR ADMISSION OF EXPERT TESTIMONY

The admission of expert testimony is governed by Rule 702 of the Rules of Evidence. The proponent of the expert testimony bears the burden of establishing its admissibility by a preponderance of proof. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001). A district court is granted broad latitude in making its determination on the admissibility of proposed expert testimony. *United States v. Gastiaburo*, 16 F.3d 582, 589 (4th Cir.) ("The trial judge has broad discretion under Rule 702."), *cert. denied*, 513 U.S. 829 (1994).

Rule 702 provides that expert testimony is appropriate when it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Rule 702 further provides that a witness qualified as an expert may be permitted to testify where "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Id.* Courts have distilled Rule 702's requirements into two crucial inquiries: whether the proposed expert's testimony is relevant and whether it is reliable. *United States v. Forrest*, 429 F.3d 73, 80

3

(4th Cir. 2005); *Boss v. Nissan N. Am.*, 228 Fed. Appx. 331, 337, 2007 WL 1482013 (4th Cir. 22 May 2007) ("Expert testimony must be both reliable and relevant.").

In order to be considered relevant, the proposed expert testimony must appear to be helpful to the trier of fact. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993). "Testimony from an expert is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror." *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993).

Reliability of a proposed expert's testimony encompasses both the expert's qualifications and the reasoning, methodology, or technique underlying the formation of the expert's opinion. *See Tunnell v. Ford Motor Co.*, 330 F.Supp.2d 707, 714-15 (W.D. Va. 2004); *Sawyer v. Southwest Airlines Co.*, 243 F.Supp.2d 1257, 1268 (D. Kan. 2003) ("Reliability analysis applies to all aspects of the expert's testimony, including the facts underlying the opinion, the methodology and the link between the facts and the conclusion drawn.") (internal quotations omitted). A witness may qualify to render expert opinions in any one of the five ways listed in Rule 702: knowledge, skill, experience, training, or education. *Kopf*, 993 F.2d at 377. The Fourth Circuit has ruled that, when an expert's qualifications are challenged, "'the test for exclusion is a strict one, and the purported expert must have neither satisfactory knowledge, skill, experience, training nor education on the issue for which the opinion is proffered.'" *Kopf*, 993 F.2d at 377 (quoting *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989)).

Apart from an expert's qualifications, a court may consider a variety of factors in determining the reliability of the expert's testimony, including: whether the expert's theory or technique has been or can be tested; whether the theory or technique has been subjected to peer review and publication; the known or potential rate of error of the technique or theory when applied; the existence and maintenance of standards and controls; and whether the theory is generally accepted. *Daubert*, 509

4

U.S. at 593-94. "While a district court's task in examining the reliability of experiential expert testimony is . . . somewhat more opaque [than with other expert testimony], the district court must nonetheless require an experiential witness to 'explain how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts.'" *United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007) (citing Fed. R. Evid. 702 advisory committee's notes).

Of course, the admission of expert testimony must be considered within the context of the other rules of evidence. In particular, Rule 403 provides that the court must ensure that the probative value of any proffered evidence is not "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. As this court has noted, "[d]espite the court's ability to exercise broad discretion and flexibility when determining the admissibility of expert testimony, the court must balance this discretion with the concerns of Rule 403 to ensure that the probative value of the proffered testimony is not 'substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'" *Bouygues Telecom, S.A. v. Tekelec*, 472 F.Supp.2d 722, 725 (E.D.N.C. 2007) (quoting Fed. R. Evid. 403).

## II.    GELL'S MOTION TO EXCLUDE AVERY'S TESTIMONY

### A.  Overview of Motion

Ransome states that he is proffering Avery as a police practices expert to provide expert testimony concerning the legal context in which Ransome conducted the 1995 Jenkins homicide investigation. (Def.'s Mem. re Avery (DE #159), pp. 2-3). These opinions are primarily in the form of statements regarding what a reasonably well-trained officer in North Carolina in 1995 and today

5

would do or believe with respect to various aspects of conducting a criminal investigation. Avery is also being offered to provide an opinion regarding the SBI.

Avery's opinions and a summary of his qualifications are set out in the report he prepared for this case. (Avery Rep. (DE #123-2), pp. 1-10). Avery's curriculum vitae ("CV") is appended to the report as an attachment. (*Id.*, pp. 7-10).

In supporting his motion, Gell concedes that a properly qualified police practices expert who can explain standard police practices for conducting a homicide investigation would be helpful to the jury in evaluating how Ransome conducted the investigation into Jenkins's murder. (Pl.'s Mem. re Avery (DE #123), p. 6). Indeed, Gell himself is offering the testimony of a police practices expert. Gell contends, however, that Avery lacks the qualifications necessary to offer the opinions that he does. Gell also raises relevance and other challenges beyond lack of qualifications to particular opinions of Avery. The court will turn first to an analysis of Avery's qualifications as they relate to his opinions generally and then address the opinions individually.

**B.      Avery's Qualifications**

Avery is a retired North Carolina Department of Justice attorney who for 25 years, from August 1973 to October 2003, served as a legal and policy advisor to two agencies, the North Carolina Department of Crime Control and Public Safety, and the Division of Motor Vehicles. (Avery Rep., pp. 1, 7). As legal and policy advisor, Avery's duties included: civil defense of law enforcement officers; evaluation of internal investigations of office misconduct; drafting policy, legislation, and educational programs; and providing general legal advice to the agencies. (*Id.*, p. 1). Avery also conducted training programs for law enforcement officers. (*Id.*, pp. 2, 8-9). Since November 2003, he has been in private practice. (*Id.*, pp. 1, 7).

6

In his report, Avery offers opinions on the practices of a reasonably well-trained officer in North Carolina in 1995 and today on: Ransome's handling of the Jenkins investigation (Opinion B); the process of bringing charges and continuing a prosecution (Opinions C and J); the pursuit of additional investigation (Opinion D); preparation of investigative reports (Opinions F, M, N); disclosure of investigative information (Opinion G); use of a polygraph (Opinion H); and reliance on witness statements (Opinion I). (Avery Rep., pp. 3-6). In addition, Avery offers an opinion on the SBI (Opinion A). (*Id.*, p. 3).

Ransome contends that Avery's career has provided him the requisite expertise to offer his opinions. Specifically, Ransome argues that Avery has developed the specialized knowledge reflected in his opinions "(1) as a legal and policy adviser to two statewide law enforcement agencies; (2) as legal counsel to agencies and officers in constitutional and civil liability cases; (3) as having conducted basic, in-service, and specialized classes and training programs on legal issues and implications (including constitutional law, civil liability, and professional/ethics standards); (4) as having reviewed law enforcement training materials for adequacy and compliance with legal requirements; and (5) as having reviewed hundreds of investigation files to evaluate the conduct of law enforcement officers involved for liability purposes, for more than 30 years." (Def.'s Mem. re Avery, p. 13). The court disagrees. While Avery's extensive legal background may well qualify him to testify as an expert on certain matters, it does not qualify him to testify as an expert on the matters which are the subject of his proposed testimony in this case. *See Channel Master Satellite Sys., Inc. v. JFD Elec. Corp.*, 748 F.Supp. 373, 386 (E.D.N.C. 1990) (testimony of an expert which is outside his area of expertise is excludable under Rule 702).

For example, a review of Avery's CV and his deposition testimony reveals that it is undisputed that Avery himself has never been a law enforcement officer and has never participated

7

in or observed a homicide investigation. (Avery Rep., pp. 7-10; Avery Dep. (DE #123-3), p. 13). Avery admits he has never taught or attended a course on homicide investigation or which concerned the duties of a homicide investigator. (Avery Dep., pp. 10-12). His legal practice has included representing the North Carolina Department of Justice in civil suits and advising the agency on its policies, but there is no evidence in the record that he has had any involvement as a legal representative in a case involving criminal investigations, homicide or otherwise, or that he has played any role in developing or analyzing department policies concerning such investigations. (Avery Dep., pp. 5-7, 13-17). Any prior experience Avery possesses as an expert witness primarily involved cases concerning officer discipline. (Avery Dep., pp. 18-23).

In addition, while all but three of Avery's opinions (*i.e.*, Opinions A, B, and H) concern at least in part the division of labor between a homicide investigator and the District Attorney's office, it has not been demonstrated that knowledge of this allocation of responsibility is within the ambit of Avery's expertise. Notably, Avery's legal career does not include experience as a prosecutor, nor has Ransome demonstrated that Avery has conducted any training in such matters. While Avery's CV lists the "New Prosecutors Course" as a class he teaches at the University of North Carolina's School of Government, his deposition testimony revealed that his role in that course is limited to topics on DWI and highway safety. (Avery Dep., p. 28). When pressed by the court at the hearing to identify precisely what qualified Avery to offer opinions on the allocation of responsibilities between investigating officers and prosecutors, Ransome's counsel did not point to anything beyond the experience reviewed above.

Indeed, even Ransome himself has acknowledged that Avery's expertise regarding homicide investigations has its limits. In his brief (DE #159, pp. 13, 15) and at the hearing, Ransome

8

essentially conceded that he withdrew Opinions E, K, and L[2] because they are not within Avery's expertise. The withdrawn opinions dealt with audio taping of witness statements, use of a suspected shooter in a homicide case to implicate another person as the shooter, and reliance on investigative work by other officers.

Finally, considering Rule 403, the court is concerned that Avery's opinions will be given added weight by the jury because of his law degree and extensive experience with law enforcement agencies, even though his expertise does not extend to the opinions at issue (with the exception of the opinion on the SBI). *See Daubert*, 509 U.S. at 595 ("Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.") (internal quotations omitted); *United States v. Lester*, 254 F.Supp.2d 602, 608-09 (E.D. Va. 2003) (in evaluating usefulness of expert testimony, court must consider the fact that "[e]xpert testimony has the potential to be substantially prejudicial because of the 'aura' effect associated with such testimony"). This is a particular danger here where there are three other police practices experts testifying for Ransome who do have firsthand experience in conducting homicide investigations and the jury may presume that Avery's legal expertise alone

---

[2] These opinions read as follows:

**Opinion E**: In 1995 and today, a reasonably well-trained officer has discretion in determining whether to make an audio recording of statements of witnesses to a crime, even a homicide. Audio taping is not the norm for law enforcement officers in North Carolina.

**Opinion K**: In 1995 and today a reasonably well-trained officer in North Carolina would not allow the person identified as the shooter in a homicide case to engage another person in a taped conversation in order to try to implicate the other person as the shooter.

**Opinion L**: In 1995 and today a reasonably well-trained officer in North Carolina relies upon the statements of other officers involved in an investigation and is not required to interview every witness.

Because they have been withdrawn, the court will not address these opinions further or arguments relating specifically to them.

9

gives his opinion on these matters more weight than is appropriate. This danger of unfair prejudice

to Gell arising from Avery's lack of relevant qualifications with respect to all but his opinion on the

SBI provides further support for exclusion of these opinions.

## C. Individual Opinions of Avery

The court now turns to an analysis of Avery's opinions individually. For ease of reference,

the opinions have been grouped by the principal topics to which they relate, although there is

admittedly overlap of subject matter among the opinions. The analysis of each opinion addresses

all pertinent portions of it, not simply those dealing with the principal subject matter.

**1. Opinion on SBI.** Opinion A states Avery's views toward the SBI. It reads:

> Opinion A: The SBI is the premier investigative law enforcement agency in North
> Carolina and has a reputation through the country as having highly qualified officers
> who meet the highest standards of integrity and ability. The training of SBI agents
> has for the last 30 years far exceeded the State required training for law enforcement
> officers and the training of any other law enforcement agency in North Carolina. The
> SBI is routinely relied upon by and provides assistance to every state and local
> law enforcement agency in North Carolina as well as the Federal Bureau of Investigation
> and other federal law enforcement agencies. My experience in the field of law
> enforcement training and teaching law enforcement officers in this State and
> throughout the county [*sic*] is the basis of this opinion. [emphasis added.]

The court finds that, with the exception of the underlined language, Opinion A would be

helpful to the jury, deals with matters outside the everyday knowledge and experience of a layperson,

and is therefore relevant. The case involves evaluation of the conduct of an officer of the SBI. In

assessing evidence relating to this issue, it would be helpful for the jury to have the background

information Opinion A provides regarding the SBI's reputation, the quality of its training, and its role

in assisting other law enforcement agencies.

The court does not believe that the statements regarding the SBI's reputation for having

agents with the highest standards of integrity and ability, and the statement regarding the high quality

10

of its training constitute impermissible, indirect comments on the personal standards and training level of Ransome. People routinely distinguish between the standards and training associated with organizations and those associated with individuals from those organizations. Indeed, the effect of this opinion would appear to be to set the bar relatively high for Ransome in these areas, which may or may not prove to favor him depending on the other evidence introduced in the case.

The court notes that Opinion A is worded in the present, except for the 30-year time frame stated for the SBI's training practices, while the investigation underlying this action occurred years ago. The court believes, however, that the jury can reasonably extrapolate from the present time to the time of the investigation. The opinion is therefore not rendered irrelevant to the extent that it addresses current aspects of the SBI.

The court does not believe the underlined language would be helpful to the jury because it is not clear what being "the premier" law enforcement agency in North Carolina means. A variety of meanings would appear to be possible, including most capable, biggest, best resourced, or most successful. The statement might well mean different things to different jurors. The court accordingly finds this statement to be not relevant. For the same reasons, the statement presents a serious risk of juror confusion within the meaning of Rule 403.

The court finds that Opinion A is reliable. Avery's experience in law enforcement training and teaching, as well as his other experience in serving the Department of Crime Control and Public Safety, and the Division of Motor Vehicles, would appear to provide him the requisite qualifications to offer the opinion. Notably, Avery was an instructor at SBI schools from 1981 to 2003. (Avery Rep., p. 8). In addition, his involvement with out-of-state, regional, and national programs and organizations would appear to qualify him to opine regarding the reputation of the SBI in the

11

country. (*Id.*, pp. 8-9). For the foregoing reasons, it is recommended that Opinion A be admitted, except for the statement regarding the SBI's alleged premier status.

    **2. Opinion on Ransome's Investigation.** In Opinion B, Avery expresses his views regarding Ransome's handling of the Jenkins investigation. The opinion states:[3]

> Opinion B: The conduct of Agent Dwight Ransome in investigating the homicide of Alan Ray Jenkins exceeded the standards for a reasonably well-trained law enforcement investigator in North Carolina. Agent Ransome was presented with a highly complex homicide investigation that was made much more difficult by the delay in finding the victim's body. His pursuit of the witnesses and evidence, while handling four other homicide and two to three major drug operations, exceeded what was and is expected of a reasonably well-trained officer in North Carolina. Agent Ransome was aware of and pointed out strengths and weaknesses of the case. He presented a thorough investigation to the District Attorney without substantial assistance from other officers.

    The court believes that this opinion is relevant to this case. The adequacy of Ransome's investigation is very much at issue in this case. The topics discussed in the opinion would be helpful to the jury in resolving this issue and deals with matters not within the everyday knowledge and experience of a layperson.

    However, Ransome has not established that Avery is qualified to opine on these matters. Indeed, the deficiency in Avery's qualifications are particularly pronounced with respect to this opinion. The opinion addresses the overall quality, complexity, and difficulty of Ransome's investigation, and certain specific practices used by Ransome. These views are suggestive of one

---

[3] At the motions hearing, Ransome conceded that what had been the last sentence in Opinion B was inadmissible as invading the province of the jury and consented to its deletion. (*Accord* Order (DE #249), pp. 13-14 (citing *Buckman v. Bombardier Corp.*, 893 F.Supp. 547, 562 (E.D.N.C. 1995)). The court has therefore not included it above. That sentence read: "The information I reviewed did not indicate Agent Ransome violated any standards for investigating the crime, did not fabricate any evidence, was objective, impartial, fair, exercised due diligence, and was professional and ethical in his investigation." Because the sentence has been withdrawn, the court will not address it further or arguments relating specifically to it.

with intimate familiarity with homicide investigations. In fact, as discussed above, Avery has not been shown to have any substantial experience with homicide investigations.

Moreover, the views expressed in Opinion B relate directly to the ultimate issues in this case. This fact, together with the substantial deficiency in Avery's qualifications to render the opinion, make risk of undue prejudice under Rule 403 particularly great with respect to this opinion. It is therefore recommended that Opinion B be excluded.

     **3. Opinions on Bringing Charges and Continuing a Prosecution.** Opinions C and J focus on the process of charging and continuing prosecution of a defendant. They read:

> Opinion C: In 1995 and today a reasonably well-trained officer in North Carolina will present complex cases, such as homicides, to the District Attorney and allows the District Attorney to determine whether to charge a suspect.

> Opinion J: In 1995 and today a reasonably well-trained officer in North Carolina is instructed that if there are conflicts in the evidence, a prosecutor may pursue criminal charges as long as probable cause exists to believe the person charged committed the crime. In a complex case the prosecutor determines whether to charge a person and once charged whether to continue the prosecution.

The court believes that both of these opinions are relevant in this case. It would be helpful for the jury to know of the allocation of responsibility between an investigating officer and the prosecutor regarding the bringing of charges and continuing prosecution because, as part of his defense, Ransome seeks to raise such issues in connection with the Jenkins investigation. These are not matters within the everyday knowledge and experience of a layperson.

In both Opinions C and J, as in most of his opinions addressing the practices of a reasonably well-trained officer, Avery speaks of such practices as of not only 1995, when the Jenkins investigation took place, but also today. It is not readily apparent why the reference to the current day is included. However, Gell has not objected specifically to inclusion of the reference to the

13

present. The court also does not find such reference improper. It arguably demonstrates continuity of the practices at issue and serve to reinforce their purported propriety. The matter could certainly be the subject of cross examination.

In addition, in Opinion C, as throughout his opinions, Avery uses the verb "will" in describing the subject conduct or beliefs of a reasonably well-trained officer (*i.e.*, "he *will* present complex cases" (emphasis added)). At the motions hearing, the court inquired whether Ransome found use of "will" objectionable on the ground that it connotes certainty about the actions or beliefs of an officer as opposed to less absolute alternatives such as "would" or "could be expected to." Ransome had no objection to use of "will." The court finds that the jury should be able to understand from the context that Avery's opinions are intended to address generally applicable practices and beliefs, and not to signify absolute certainty about the actions or beliefs of a particular officer. This point could certainly be developed on cross examination should Gell deem it appropriate to do so.

However, for reasons previously discussed, Ransome has not demonstrated that Avery has expertise in the areas addressed by these opinions, namely, division of responsibility between investigators and prosecutors, and criminal investigations, including homicide and other complex investigations. It is therefore recommended that Opinions C and J be excluded.

**4. Opinion on Additional Investigation.** Opinion D deals primarily with the pursuit of additional investigation. It reads:

Opinion D: In 1995 and today a reasonably well-trained officer in North Carolina will allow the District Attorney to determine whether additional investigation is warranted in complex cases, such as homicides. Such additional investigation may include interviewing new witnesses, seeking additional evidence or reinterviewing witnesses.

14

The court finds this opinion to be relevant. This case presents the issue of whether and when Ransome should have undertaken additional investigation. Opinion D would be helpful to the jury in its consideration of evidence on this issue and the information in the opinion is not within the everyday knowledge and experience of a layperson.

Nevertheless, the court finds that the opinion does not have the requisite reliability because of Avery's lack of qualifications to offer it. This opinion deals specifically with police practices in complex cases. As discussed, Avery has not been shown to have special knowledge regarding police practices in criminal investigations generally, or homicide or other complex cases in particular. Accordingly, it is recommended that Opinion D be excluded.

**5. Opinions on Investigative Reports.** Opinions F, M, and N relate in large part to preparation of investigative reports. They read as follows:

> Opinion F: In 1995 and today a reasonably well-trained officer in North Carolina will provide the District Attorney a report of all relevant evidence including exculpatory evidence.

> Opinion M: In 1995 and today a reasonably well-trained officer in North Carolina assumes the prosecutor has read and is familiar with the investigative report.

> Opinion N: In 1995 and today a reasonably well-trained officer in North Carolina exercises judgment and discretion in how to conduct a criminal investigation including how, when and where to interview or reinterview witnesses in order to obtain the most accurate facts from them. In 1995 and today a reasonably well-trained officer in North Carolina exercises judgment and discretion in how to record in the report of investigation the most accurate rendition of information received from a witness. Officers in North Carolina are instructed that the ultimate use of an investigative report is for the prosecution of persons before the criminal justice system and must be prepared with this use in mind. Officers are instructed to use quotations around statements that are direct quotes in a report of investigation so that any other reference to what a witness says is the officer's rendition of the substance of what the witness told the officer. In 1995 and today a reasonably well-trained officer in North Carolina assumes that a prosecutor will not consider a statement in a report of investigation is a quotation from a witness unless quotation marks are used or the statement is signed by the witness.

15

The court believes that all these opinions are relevant. They would provide the jurors helpful information in determining whether Ransome adequately included information in any investigative reports he prepared and are not within the everyday knowledge and experience of a juror.

However, Ransome has not shown that Avery is qualified to offer these opinions based on the considerations previously discussed. The lack of qualification is particularly apparent with respect to the statement in Opinion N that use of quotation marks is essential to indicate the verbatim quotation of a witness. This statement concerns the day-to-day mechanics of report writing to a greater extent than the other views offered in this opinion. It is difficult to distinguish such minutiae from that discussed in Opinions E, K, and L about which Ransome conceded Avery was not qualified to offer expert opinions.

In challenging Avery's qualifications to offer Opinion M, Ransome cites to language in the SBI Report Writing Manual which contradicts the opinion. (SBI Manual (DE #123-6), p. 2). The court does not believe that the conflict shows Avery to be unqualified to offered Opinion M, but rather, as Ransome contends, that it goes to the weight of the opinion. Nonetheless, because Avery has not for other reasons shown Avery to be qualified to render Opinions F, M, and N, it is recommended that they be excluded.

**6. Opinion on Disclosure of Investigative Information.** Opinion G, which relates primarily to disclosure of exculpatory and other investigative information, states:

> Opinion G: In 1995 and today a reasonably well-trained officer in North Carolina will not provide evidence to a suspect, his attorney, a defendant, the defendant's attorney or the Court. The representative of the State is the District Attorney and the release of information in the criminal investigation is the responsibility of the District Attorney. This includes exculpatory information required by state and federal law. In 1995 and today a reasonably well-trained officer in North Carolina does not determine what information is discoverable or should be presented to a court or attorneys for a defendant. [Emphasis added.]

16

Police practices regarding the release of exculpatory and other investigative information would not likely be matter known by the average person and would assist the jury in weighing the evidence in the case, in which Ransome's handling of allegedly exculpatory and related evidence is at issue. The court therefore believes that these topics are relevant.

However, the statements underlined above are stated as legal conclusions, not beliefs or understandings of reasonably well-trained officers. The court therefore finds that these statements, as set out, are excludable on the grounds that they improperly usurp the court's role in providing instructions on the applicable law. *Safeway, Inc. v. Sugarloaf P'ship*, 423 F.Supp.2d 531, 539 (D. Md. 2006) ("Evidence supplied by experts as to legal conclusions is not admissible, nor indeed evidence at all.") (internal quotations omitted); *see also United States v. Barile*, 286 F.3d 749, 760 (4th Cir. 2002) ("Expert testimony that merely states a legal conclusion is less likely to assist the jury in its determination."); *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997) ("Each courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards.").

Opinion G is inadmissible as a whole on the independent ground that Ransome has not established that Avery is qualified to offer Opinion G for the reasons discussed above. It is therefore recommended that Opinion G be excluded.

**7. Opinion on Use of Polygraph.** Opinion H deals with polygraphs and reads as follows:

Opinion H: In 1995 and today a reasonably well-trained officer in North Carolina is trained that the polygraph is an investigatory tool that is not admissible in court on behalf of the State or the defendant. Officers have discretion when or if to have a polygraph administered. Pretest and posttest admissions are usually the most helpful information obtained from a polygraph test.

Ransome's decisions about whether or not to administer a polygraph test to Gell and other witnesses in the case have been called into question by Gell. Thus, the usefulness and admissibility of a polygraph test are areas that are relevant to the issues in this case. The court does not agree with Gell's contention that Opinion H states legal conclusions. The statements in this opinion are expressed in terms of training an officer receives and police practices with respect to polygraphs.

Irrespective of relevance, however, Ransome has not established how Avery is qualified to opine on the usefulness of the polygraph test in a homicide investigation. Ransome has not presented evidence that Avery has himself used a polygraph test in the course of an investigation or trained officers on its use, admissibility in court, or helpfulness in conducting an investigation. It is accordingly recommended that Opinion H be excluded.

**8. Opinion on Reliance on Witness Statements.** Opinion I, which relates primarily to witness statements, reads:

> Opinion I: In 1995 and today a reasonably well-trained officer in North Carolina relies upon statements of persons who are involved in crimes to identify other persons involved in a crime and will rely upon this information in determining whether to take a case to a District Attorney.

The court believes that this opinion would be helpful to the jury in this case, in which Ransome's use and reliance on witness statements are in issue, and that they are not within the everyday knowledge and experience of a juror. The question of helpfulness is not as clear with respect to this opinion as with other opinions since most people are likely aware that police obtain statements by suspects for the purpose of identifying other suspects. However, this opinion includes the notion that officers rely on such statements to the point of using them in deciding whether to take a case to the prosecutor. The court believes that such reliance may well not be within the everyday knowledge and experience of a layperson.

18

Notwithstanding the relevance of Opinion I, the court believes that it is not reliable because of Avery's lack of qualifications to render it. The court bases this conclusion on the considerations previously discussed. Therefore, it is recommended that Opinion I be excluded.

In sum, subject to further pretrial and trial proceedings, and the presiding Chief District Judge's authority over them, it is recommended that Gell's motion to exclude Avery's testimony be GRANTED in PART and DENIED in PART, and that the testimony of Avery be excluded except for the portions of Opinion A other than the statement regarding the SBI's "premier" status.

## III.    RANSOME'S MOTION TO EXCLUDE HANEY'S TESTIMONY

### A.    Overview of Motion

As stated by Haney in his report, Gell identified him as an expert in order to offer opinions on three topics: (1) "the psychological effects of incarceration in general, and also the effects of being incarcerated under certain specific conditions of confinement"; (2) "the psychological effects of incarceration on James Alan Gell resulting from his wrongful arrest in 1995 and his conviction and death sentence meted out in February, 1998, through the time of his release in 2004"; and (3) "the seriousness and lasting psychological effects of a long period of confinement on someone like Mr. Gell, who was exonerated and released to free society after some 9 years of incarceration." (Haney Rep. (DE #212), p. 1). The report, which is supplemented by answers to written deposition questions (DE #202-2),[4] includes opinions on all three topics. Topic (1) is addressed principally in section III, pages 4-9, and section IV, pages 10-18, of Haney's report; topic (2) in section V, pages 18-27; and topic (3) in section VI, pages 27-32. In addition, in his principal memorandum on the instant motion, Gell argues that the opinions on all three topics are relevant and reliable, and

---

[4] The deposition questions appear at pages 1-12 and the answers at pages 13-17 of DE #202-2.

therefore admissible. (Plf.'s Mem. (DE #234), *e.g.*, pp. 2, 14 (the motion to exclude "should be denied in full")).

However, at the motions hearing, Gell's counsel stated that Gell no longer intended to proffer Haney's testimony on topics (2) and (3). Gell's counsel conceded that Haney is not a clinical psychologist and could not establish a clinical causal relationship between Gell's incarceration and his specific damages suffered. Rather, Gell is now seeking to have Haney provide testimony on only topic (1), that is, the psychological effects of incarceration in general. Accordingly, as to those portions of Ransome's motion which seek to exclude Haney's testimony concerning topics (2) and (3), it is recommended that the motion be GRANTED based on Gell's withdrawal of such testimony and that such testimony be excluded.[5]

In the memorandum supporting his motion (DE #196) and at the hearing, Ransome opposed Haney's proposed testimony on topic (1) principally for lack of reliability because of failure to apply the proper methodology, but also for lack of relevance. The court will address each argument separately following an examination of Haney's general qualifications.

## B. Haney's Qualifications

Haney's qualifications are set out in a CV (DE #198) attached to his report and on a printed copy of his web page at the University of California at Santa Cruz (DE #203). Haney is a professor of psychology at that university. (Haney CV, pp. 1-2; Haney Web Page). His educational background includes a Bachelor of Arts degree, a Masters degree, and a Ph.D. in psychology, as well as a law degree. (Haney CV, pp. 1-2). His 30 years of academic research and writings largely focus

---

[5] Because of the withdrawal of Haney's opinions regarding topics (2) and (3), the court will not address them further. Similarly, much of Ransome's argument on the instant motion concerned topics (2) and (3), and such arguments have been mooted by the withdrawal of Haney's testimony regarding them.

on the social and psychological principles of incarceration. (*See id.*, pp. 5-25; Haney Web Page). Haney has been employed as a consultant to conduct evaluations of prison conditions and has authored numerous publications in peer-reviewed journals on the psychological effects of incarceration on imprisoned individuals. (*See* Haney CV, pp. 5-25). In addition, Haney has been qualified an expert in federal courts on multiple occasions. (*Id.*, pp. 25-28; Lit. Exp. List (DE #198); Haney Written Dep., Ans. nos. 16, 18, pp. 14-17).

## C.  Haney's Opinions

**1. Reliability.** Ransome does not challenge Haney's knowledge or background in the study of prison conditions and the psychological effects of imprisonment. Indeed, in his reply brief,

Ransome specifically states that he "does not dispute that Haney has studied, written, presented, and is widely-recognized as a preeminent scholar on prison environments and the psychological effects of various forms of confinement." (Def.'s Reply re Haney (DE #236), p. 2). Rather, Ransome contends that Haney offers only general and abstract opinions and has not followed his own methodology of assessing the conditions of confinement and linking those conditions to any psychological effects with respect to any of the particular facilities that housed Gell. Ransome accordingly maintains that Haney's opinions in this case are inherently unreliable. For the reasons that follow, the court disagrees.

Haney's answer to Ransome's written deposition question no. 15 belies the notion that the development of his opinions in this case did not conform to his general practice. In question no. 15, Haney was asked to describe his methodology in conducting the evaluations of conditions of confinement at other facilities he had assessed. (Haney Written Dep., Ques. no. 15, p. 7). In his

21

answer, Haney stated that the basic methodology he used in those cases was the same as the one in this case, and he then described this methodology:

> Each case is somewhat different. In each case, however, I do what I have done here: I review the relevant literature on the specific kind or condition at issue; I then use my professional knowledge—own direct knowledge and experience and knowledge gained from the research of other scholars—to form an opinion about the effects of that particular form of incarceration. Of course, that requires me to review the relevant, available case-related materials (for example, prison files, medical and/or psychiatric records), and make direct observations and conduct interviews with prisoners and others to form an opinion about the effects of that incarceration.

(Haney Written Dep., Ans. no. 15, p. 14).

In accordance with this methodology, Haney developed his opinion in this case based on his review and knowledge of published literature regarding the effects of incarceration; his own experience and research in this area; his review of deposition testimony by Gell and prison medical and mental health records for Gell; and photographs of death row in North Carolina. (Haney Rep., p. 2; Haney Written Dep., Ques. & Ans. no. 8, pp. 4, 13). In addition, Haney interviewed Gell, his mother and grandmother, a friend of Gell, two friends of Gell's family, and a North Carolina sociology professor researching death row inmates. (Haney Rep., p. 2; Haney Written Dep., Ques. & Ans. nos. 1, 3, pp. 1, 2, 13). Haney also visited twice one of the facilities in which Gell was housed. (Haney Written Dep., Ques. & Ans. no. 5, pp. 5, 13).

Ransome cites to more thorough assessments that Haney used in some cases but did not employ in this case, including but not limited to: more extensive document review; more tours and inspections of facilities; interviews with staff and inmates; and systemic studies of the incidence of symptoms of psychological trauma and effects of isolation among inmates. (Def.'s Mem. re Haney, p. 14). Ransome contends that Haney's failure to utilize these more extensive techniques with

22

respect to the specific facilities where Gell was incarcerated serves as evidence that the methods used by Haney in Gell's case are not sound.

However, because Haney is being offered to present his opinion solely on the effects of incarceration in general, and not with respect to Gell in particular, the court is not persuaded that Haney was required to conduct such a full-scale analysis of each facility where Gell was imprisoned. Certainly, Ransome may cross examine Haney regarding the particular characteristics of the facilities where Gell was housed and what, if any, bearing these characteristics have on the applicability to Gell of the general principles about which Haney testifies. Ransome may also cross examine Haney regarding the particular characteristics of Gell's psychological condition and their impact, if any, on the applicability of Haney's opinion. The court believes that a jury, particularly with the benefit of such cross examination, would have the capacity to evaluate appropriately the extent to which the general principles reflected in Haney's opinion should be applied to Gell. *See Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999) (in making a determination on the reliability of expert testimony, "the court need not determine that the expert testimony a litigant seeks to offer into evidence is irrefutable or certainly correct. As with all other admissible evidence, expert testimony is subject to being tested by vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.") (internal citations omitted); *Reynolds v. Crown Equip. Corp.*, 5:07CV00018, 2008 WL 2465032, at *15-16 (W.D. Va. 16 June 2008) (court found experts' testimony sufficiently reliable, noting that inconsistencies would be subject to vigorous cross-examination and would go to the weight given experts' testimony, not admissibility). In short, the degree of thoroughness of Haney's evaluation of the particular characteristics of Gell's incarceration and psychological condition go to the weight to be given Haney's opinion, not its admissibility.

**2. Relevance.** Ransome argues that Haney's opinion will not assist the jury because it consists of common knowledge within the purview of the average juror. The court disagrees.

While the fact that prison is unpleasant and can cause psychological problems may be something within the everyday knowledge of the average juror, Haney's opinion goes well beyond such a general understanding of the effects of incarceration. His opinion contains a detailed assessment of particular psychological effects commonly exhibited by inmates not only during, but also after incarceration. (Haney Rep., pp. 4-9). This assessment includes an explanation of the "prisonization" process by which incarceration brings about these effects. (*Id.*, pp. 6-9). Further, Haney identifies certain specific factors—such as overcrowding, segregation and isolation, long-term imprisonment, death-row confinement, and imprisonment when innocent—which purportedly exacerbate the harmful psychological effects of imprisonment. (*Id.*, pp. 10-18). He also explains how such exacerbation occurs. (*Id.*). In footnotes throughout this portion of his report, Haney cites to scholarly works on these subjects. The court does not believe the subjects addressed by Haney are within the everyday knowledge or experience of an average juror. Accordingly, the court believes that Haney's opinion contains specialized knowledge that the jury would find helpful in evaluating what, if any, harm Gell suffered from his imprisonment.

Finally, Ransome argues that Haney's testimony is unnecessarily cumulative in light of the ability of Gell and his friends and family members to testify based on firsthand knowledge of Gell's condition during and after his imprisonment. As noted previously, the admission of expert testimony must always be considered within the context of other rules of evidence, including Rule 403. The court cannot say on the record before it that Haney's testimony would be cumulative. Rather, Haney's testimony would appear to provide the jury information that it can use to analyze firsthand

24

testimony regarding Gell. This determination, however, is subject to further development of the record in this case.

In sum, it is recommended that Ransome's motion to exclude Haney's testimony be GRANTED with respect to topics (2) and (3) and DENIED with respect to topic (1).

## CONCLUSION

For the foregoing reasons, and subject to further pretrial and trial proceedings and the authority of the presiding Chief District Judge over such proceedings, IT IS RECOMMENDED that:

1.      Gell's motion to exclude Avery's testimony (DE #122) be GRANTED with respect to the statement regarding the SBI's "premier" status in Opinion A, but no other portions of Opinion A, and the remaining opinions of Avery (*i.e.*, Opinions B through N), and Avery not be permitted to testify regarding such statement or remaining opinions; and be DENIED with respect to the portions of Opinion A other than the statement regarding the SBI's "premier" status and Avery be permitted to testify regarding such other portions of Opinion A.

2.      Ransome's motion to exclude Haney's testimony (DE #195) be GRANTED with respect to topics (2) and (3) (based on the withdrawal of such testimony) and such testimony be excluded; and the motion be DENIED with respect to topic (1) and Haney be permitted to testify regarding that topic.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have ten business days or such other time as the Chief District Judge directs, to file written objections. Failure to file timely written objections bars an aggrieved party from receiving a de novo review by the Chief District Judge on an issue covered in the Memorandum and

Recommendation and, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the Chief District Judge.

SO ORDERED, this 1st day of December, 2008.

James E. Gates
United States Magistrate Judge

26